Dissenting opinion, by
Judge Hitchcock:
The decree which was sought to be reviewed in this case was rendered by this court at its December term, 1836. Differing from a majority of the court rendering that decree, and differing from that same majority in the decision of this case, which goes to affirm it, it seems to be proper, considering the importance of the principle decided, that I should state the reasons which have led me to a different conclusion from that arrived at by my brethren.
The original case was an application by Mary C. Allen, as the widow of George W. Allen, for dower in a certain town lot in the town of Columbus. The facts of the case were not multifarious. In 1801, George W. Allen was possessed of seven half-sections of land in the Northwestern Territory, now situated in the counties of Licking, Fairfield, and Franklin, containing 320 acres each, and being parts of the Refugee tract, so called. In 1803, he intermarried with the complainant. In 1805, he mortgaged the lands to John Langdon, by deed, executed in some of the Eastern states, probably Now Hampshire, *and in 1806 died. In 1809, proceedings by scire facias were had upon this mortgage, and the lands were sold at sheriff’s sale to Lyne Starling. At the time of the execution of the mortgage, and until after the sheriff’s sale, the lands were wild and uncultivated. Neither George W. Allen nor the complainant were ever within the Northwestern Territory, nor within the State of Ohio. In the year 1812, Starling, in conjunction with others, laid out the town of Columbus, about one-half of which is located on one of the half-sections mortgaged to Lang-don ; and in the same year the seat of government of the State of Ohio was established in the town thus laid out. As an inducement to procure the location of the seat of government, Starling and those connected with him in laying out the town, made donations to the state, in land or otherwise, to the amount of $50,000 or more. The defendant owns lot No. 264, in fee simple, deriving title from Starling. Upon this lot .large and valuable improvements have *475 been made, and it-is in the heart of the city. The defendant, also, owns two other lots in the city, on which improvements have been made, and he has contributed largely in taxes and otherwise for the general improvement of the place. To recover dower in. lot No. 264, the plain tiff brought her suit. Her petition was filed twenty-nine,years alter the land was alieped by her husband, and twenty-eight years after her right of dower was consummated- by bis death.
The court decreed in favor of the complainant, and decided that she was entitled to be endowed according to the value of the grounds, at the time of the assignment, excluding increase of value from improvements made by the alienee, but including increased value from other extrinsic and general causes.
To reverse this decree, this bill of review has been filed; and upon the hearing, the bill has been dismissed, thereby affirming the original decree. Believing the decree to be wrong in principle and upon authority, I deem it proper to state the reasons upon which my opinion is founded, and shall do it in as succinct a manner as the importance of the case will justify.
Dower is of ancient origin ; so much so, that it is uncertain when it was first introduced into England. By the common law, the wife was entitled to the use, during her life, of one third part of the lands and tenements which were her husband’s during coverture. Co. Lit., ch. 5, sec. 36, 37. It is said by the editor of the eleventh edition of Coke’s Com. upon Lit., “ The ^reasons why the law gave the wife dower will appear, if we consider how the law stood anciently; for, by the old law, if this provision had not been made, and the party at the marriage had made no assignment of dówer, the wife would have been without any provision, for the personal estates even of the richest were then very inconsiderable; and before trusts were invented, which is but lately, the husband coiild give his wife nothing during his own life ; nor could he provide for her by will, because lands could not be devised, unless it was in some particular places by custom, till the statute of Henry Till.” Coke’s Com. 31, n. 178, a, 15 Ed. Hence the indulgence with which dower was treated by the courts, and hence the reason why it became coupled with “life and liberty,” as the three things which were peculiarly favored in law. But the times have changed, circumstances have changed, and in accordance with, the maxim, “ that when *476 the reasons of the law cease, the law itself should cease,” this principle no longer exists in England. By the statute of 3 and 4 William IY, it is enacted “that no widow shall be entitled to dower in any land which shall have been absolutely disposed of by her husband in his lifetime or by his will.”
In most of the states of this Union, the principles of the common law upon the subject of dower have been adopted, either as the common law of the land or by statutory provision; and the widow is entitled to dower in all the lands of which her husband was seized, as an estate of inheritance during the coverture. The same is the law in this state. In Connecticut, Yermont, North Carolina, and Tennessee, it is different. In those slates the widow can only be endowed of the lands of which the husband dies seized.
Such being the principle of the common law, as well as the laws of the several states and of this state, if we can ascertain the rule adopted in England and our sister states in the assignment of dower, where lands have been aliened during the lifetime of the husband, it would seem to be proper for this court to adopt the same rule. From the most careful examination which I have been able to give the subject, it seems to me to be clearly established that the rule adopted in such cases in England at an early period, and continued without variation, was that in such case the widow should be endowed according to the value of the property at the time of the alienation by the husband and not at the time of the assignment. With a single exception the same *rule has been adopted in every state in the Union where the common law doctrine of dower has been recognized. The same rule, too, was adopted in this state, and prevailed until the decision of the case of Dunseth v. Bank of the United States. 6 Ohio, 76.
As to the case last cited, it seems to me proper to place it out of view as an authority in this case, because that case is now open upon a bill of review and can not be considered as finally disposed of.
But before proceeding further in the investigation of this part of the case, it may be proper to examine a preliminary point made by the claimant’s counsel. It is claimed by them that the right of dower in this case, so far as respects the extent to which the widow shall be endowed, depends upon the ordinance of 1787, *477 •which was the law upon this subject in 1803, when the complainant intermarried with her late husband, George W. Allen. If, in this, counsel are correct, it would seem to me there must be an end of the case; for, to my understanding, the ordinance clearly enacts the principles of the laws of Connecticut, North Carolina, Yermont, and Tennessee. It provides that the widow shall be endowed of the lands of which her husband died seized, and it makes no provision for dower beyond this. It is in these words:
“ That the estates, both of residents and non-resident proprietors, in the said territory, dying intestate, shall descend to and be distributed among their children and the descendants of a deceased child in equal parts; the descendants of a deceased child or grandchild to take the share of their deceased parents, in equal parts, among them; and where there shall be no children or descendants, then in equal parts to the next of kin in equal degree; and among collaterals, the children of a deceased brother or sister of an intestate shall have, in equal parts, among them, their deceased parents’ share; and there shall, in no case, be a distinction between kindred of the whole and half blood; saving, in all cases) to the widow of the intestate the third part of the real estate for life, and one-third of the personal estate; and this law, relative to descents and dower, shall remain in full force until altered by the legislature of the district.” 1 Chase’s Ohio L. 66,.
This law makes provision for the manner in which the estate of an individual dying intestate “shall.descend and be distributed.” His estate can not descend until he is deceased, and then only that estate of which he is seized at the time of his death. This law, *too, makes provision for the disposition of the whole estate, both real and personal, and it makes no difference in the manner of the descent or distribution, except as to the widow. “Saving in all cases to the widow of the intestate, her third part of the real estate/or K/e, and one third-part of the personal estate.” “Saving,” what from? Unquestionably from that which is the subject matter of this particular legislation. And that was the estate of which a proprietor, whether resident or non-resident, might die seized. No other real estate could descend, no other personal estate could be distributed, and of no other could a widow, under this law, be endowed. It seems to me, that under the ordinance, there would be the same propriety in saying that the widow should have one-third of the personal estate of which her husband was possessed *478 during coverture, as one-third.of the land of which he was seized during the same period.
It may bo remembered further, that in that part of the law in which the shares of the heir and widow are provided for, dower is • not named, although it is in a subsequent clause.
If the inquiry should be made why Congress should, by this ordinance, adopt a different rule as to dower, from that adopted at common law and in some of the states in the Union, the answer may be found in the argument of claimant’s counsel. “ The Northwestern Territory was then a wilderness of forest and prairie, with scarcely a cultivated spot in its vast extent. Large tracts of this country had become the property of individuals, .residing principally in Yirginia and the New England states; and the remainder was held by the United States for appropriation in bounties to the officers and soldiers of the revolution, residing in the various states, or for sale to individual purchasers.” It might be added that three millions and a half of acres of land in this same territory were the property of the State of Connecticut — a state in which the widow was never endowed, except of the lands of which her husband died -seized. It was pr-obably foreseen that lands thus owned and thus to be brought into market would become like articles of merchandise, and with almost the same facility as goods and chattels, pass from hand to hand. To establish the same rule as to dower for a country so situated, and for a country too, where, by the same organic law, anRndividual was allowed to dispose of his real estate by will or deed, would bave'boon highly impolitic. It must, to a great extent, have operated to prevent the alienation of land. For it will be seen by the same section of the ordinance, that although provision is made that “real ^estates maybe conveyed by lease and release, or bargain and sale, signed, sealed, and delivered, by the person, being of full age,, in whom the estate may be, and attested by two witnesses,” etc., yet no provision is made as to the manner in which a married woman may divest luv-self of her interest in land, or relinquish a right of dower. It was not until August, 1795, that there was any law in the territory authorizing a married woman to convey land; and then a law for that purpose was adopted from Pennsylvania. 1 Chase’s Ohio L. 186. Nor was it until 1804, that provision was made whereby a wife could relinquish dower.
Can it be believed that if Congress, in the adoption of the ordi *479 nance of 1787, which was the organic law of the territory, had intended that the wife should be endowed of all the land of which the husband was seized during coverture, they would not have made some provision by which she might release this right? The circumstance that no such provision was made, operates strongly in my mind to lead to the conclusion that they intended nothing further than what the language used imports, that she should be endowed of those lands, and those only, of which the husband was seized at the time of his death.
In this law there was no change until after the organization of the state government. The object of the law of 1795, entitled “ a law for the speedy assignment of dower,” 1 Chase’s Ohio L. 187, is well defined by its title. It does not proscribe to what extent a widow shall be endowed, but the manner in which she shall obtain her dower in those lands in which she is entitled to it.
I have probably taken up more time in the examination of the ordinance upon the subject of dower than was necessary, and more than I should have done, but for the importance counsel have attached to it. Clearly to my mind, under the ordinance, the complainant in this case would not have been entitled to dower, because the land in which dower is claimed, was aliened by her husband in his lifetime.
On January 19, 1804, the legislature passed “an act regulating dower,” in which it is expressly provided, “that the widow shall be entitled during her life to the use of one third-part of all the real property that her husband was' seized of during coverture, unless she shall have joined with her husband in the conveyance.” 1 Chase’s Ohio L. 395. By this act the common-law principle with respect to dower was adopted, and at the same time that the legislature adopt this principle, they provide the *way in which the wife may relinquish her right, and that is by joining with her husband in the conveyance.
The act of February 12, 1805, upon the same subject, repealed the law of 1804, but did not change the principle as ‘to dower. This latter law was in force at the time the mortgage to Langdon was executed. The petitioner did not join in that conveyance, and I do not, as at present advised, see why under its provisions she is not entitled to dower.
I will not proceed to ascertain what was the rule adopted in England, with respect to the assignment of dower where lands *480 had been aliened in the life of the husband. At a very early period, a different rule was adopted, where the demand was made of the heir, and where of an alienee of the husband. In the one case, the widow was to be endowed as of the value of the land at the time dower was assigned; in the other, as of the value at the time of alienation. “If the husband make a feoffment in fee of lands, and the feoffee builds thereon, and improves the same greatly in value, yet the wife of the feoffee shall have dower only according to the value in the husband’s time.” 2 Bac. Abr. 368. “ If the heir improve the land by building, or sowing, the wife shall recover her dower with the improvements upon it, because by her husband’s death her title to dower was consummated, and the improvements, as to her part, were quasi upon the land.” Ib. The same principle is laid down in Coke upon Littleton, 32, a, and Hargrave, n. 193 to Coke Lit. 1, says, “if feoffee improve by buildings, yet dower shall be as it was in the seisin of the husband.” To sustain which position he cites 17 Hen. 3, Dower, 191, and 31 Ed. 1, Voucher, 288, and adds, “ for the heir is not bound to warrant, except according to the value as it was at the time of the feoffment, and so the wife would recover more against the feoffee, than he would recover in value, which is not reasonable.” Chancellor Kent, in treating on this subject, says, “ In cases of alienation by the husband, the general rule is, that the widow takes her dower according to the value of the land at the time of the alienation, and not according to its subsequent increased or improved value. This was the ancient and settled rule of the common law, and the reason of the rule is said to be, that the heir was not bound to warrant except according to the value of the land as it was at the time of the feoffment; and if the wife was to recover according to the improved value subsequent to the alienation, she would recover more against the feoffee than he would recover of the heir. *The reason assigned in the old books has been ably criticised and questioned in this country ; but the rule itself is founded in justice and sound policy, and whether the land be improved in value or be impaired by the act of the party subsequently, the endowment in every event of that kind, is to be according to the value at the time of alienation, in case the husband sold in his lifetime; and according to the value at the time of the assignment, if the land descended to the heir.” 4 Kent’s Com. 65, 66. Whether the reasons assigned in the old books for this rule are or are not *481 satisfactory, is not very material so long as the rule itself “is founded in justice and sound policy.’’
These authorities, without quoting others, are sufficient to show what the common law rule upon this subject was, and I am not aware that upon this point there is any difference of opinion. They show further that this rule was established as early as 1230, and has continued in force in the country where established more than six hundred years.
The common law principle of dower having been adopted in most of the states of the Union, it was to have been expected that the rules established at common law with respect to its assignment would be adopted; and so we find it. Previous to 1819, not a case has been found in any one of the states, recognizing any other rule than that dower, in case of alienation, should be assigned according to the value of the property “in the seizin of the husband.” And even at the present time it is not known that any other rule has been established in any of the states except in Pennsylvania, although perhaps there may be some doubt with respect to Kentucky, in consequence of a decision reported to have been made in that state, as late as in 1833. In making these remarks, I do not forget the ease of Powell et ux v. Morrison and Brimfield Manufacturing Company, 3 Mason, 347. This was a case decided by Judge Story, in the Circuit Court of the United States, in Massachusetts. Although the opinions of that learned judge will be by me always held in the highest estimation, yet his decisions upon a question concerning the internal policy of a state can not be considered as the law of that state until adopted by its courts, and I do not find that the courts of Massachusetts have followed his decision in this case.
Chancellor Kent, after using the language before cited, proceeds thus: “This is the doctrine of the American cases, and they are in conformity with the general principles of the English law, as to the time from which the value of the dower is to.*be computed, both as it respects the alienee of the husband and the heir.” 4 Kent’s Com. 76. In the case of Humphreys v. Phinney, the same jurist, in delivering the opinion of the court, says, “ The widow is not entitled to dower according to the improved value of the land, in case of alienation. This is the rule prescribed in such cases by the act, 4 N. T. Laws, 616, and the statute did not, in, this respect, introduce a new rule, for such was the law as understood *482 «and declarad in the most ancient .decisions of which we have any report.” And so it was decided. 2 Johns. 484.
In the case of Dorchester v. Coventry, which was also an .action of dower, Chief Justice Thompson, in delivering the opinion of the court, after remarking that the case could not be distinguished from that of Humphrey v. Phinney, before cited, says, in speaking further of that case, ‘,‘the language of the chief justice is plain and explicit, that the widow is not entitled to dower ac •cording to the improved value, and all the cases referred to as analogous go to establish this point. The statute (1 N. Y. L. 60) can not admit of any other reasonable interpretation. It declares that the dower of any land sold by the husband shall be according to the value of the land, exclusive of improvements made since the sale. And it can not be presumed that the legislature intended to make a distinction between improvements and the increased value of the land. The same principle applies to both. 11 Johns. 509.
Before leaving this case, it may be proper to remark that precisely the identical principle, which is contended for in the case now before the court, was contended for in the ease of Dorchester v. Coventry, and that principle is this: that although the widow is not entitled to the benefits of improvements made by the alienee, yet she is entitled to the benefit of the increased value of the land from extrinsic causes. And the dictum of Chief Justice Parsons, in Gore v. Brasier, was relied on by the counsel for the plaintiff. Still the court did not see the force of the distinction, but say expressly “that the same principle applies to both.”
It is argued, however, by counsel that this authority must be disregarded, because the court's in New York are governed by the statute of that state, and not by the principles of the common law. Chief Justice Kent, in the case of Humphrey v. Phinney, says, and surely he ought to know, “the statute did not in this respect, introduce a new rule, for such was the law as understood *and declared in the most ancient decisions of which we have any report.”
I have not the statute of New York before me, but according to the statement of Chief Justice Thompson, in Dorchester v. Coventry, before quoted, “ it declares that the dowrer of any land sold by the husband shall be according to the value of the land exclusive of improvements since the sale.” -What is the rule of the common law? “If the husband make a feoffement in fee of *483 lands, and the feoffee builds thereon, and improves the* same greatly in value, yet the wife of the feoffor shall have dower only according to the value in the husband’s time.” 2 Bac. Abr. 368. Or according to Chancellor Kent, “the widow takes her dower according to the value at the time of alienation, and not according to its subsequent increased or improved value.” “ This,” says he, “ was the ancient and settled rule of the common law.” 4 Com. 65. Now if there be any substantial difference between the rule as prescribed by the statute of New York, and the common law rule, I must confess I can not see it. The statute prescribes that ■“ dower in laud sold, shall be according to the value of the land, exclusive of improvements since the sale.” The common law says that “the widow takes her dower according to the value at the time of alienation, and not according to its subsequent increased or improved value.” Where is the difference? If there be any, the statute is more favorable to the widow than the common law. But the courts in New York say there is none, and it appears to me that in this they are correct. The truth is, in that ■state, the rule of the common law has been embodied in their ■statute. The rule remains the same, and it is in vain for the counsel to attempt to evade the authority of the cases in that state, by saying they are the mere constructions of a statute.
The same question came before the Supreme Court of the State of New York, in the case of Dolf v. Basset, decided in 1818, and the court again held that “ dower of land aliened by the husband, in his lifetime, is to be assigned according to the value of the land at the time of alienation. 15 Johns. 21. ¡
Again, the same court had the same subject under consideration 1 in the case of Walker v. Schuyler, decided in 1833. 10 Wend. 480. The great question in this case, as well as in that of Dorchester v. Coventry, was whether the widow was entitled to the benefit of the increased value of the land not arising from the improvements made by the alienee, and the court held that she was not; thereby sustaining their former decisions.
*In the case of Shaw v. White, 13 Johns. 179, the court say, “ the widow does not have the benefit of improvements, or of the increased value of the land.”
I will refer to one more case, and only one more in New York, and that is the case of Hale v. James, 6 Johns. Ch. 258. And this case is referred to the more particularly because it was a case *484 decided by Chancellor Kent, and strong reliance is placed upon, the opinions of that jurist by the complainant’s counsel, to sustain themselves in the position which they assume in this case. This-case was decided in 1823. It was a petition for dower. The land had. been mortgaged in 1814, the equity of redemption was released in 1817, the defendant took possession in 1819, and the husband died in 1821. It was held that as the mortgagee continued in possession alter the mortgage was executed, the alienation did not take-effect until 1817, when the equity of redemption was released. In 1817, the lands were worth §7,333, and in 1821, $6,166-The defendant insisted that the widow should be endowed according to the value of the land in 1821, when the husband died, and' her right of dower was consummated. But the chancellor held otherwise. He says, “the rule is fixed and steady, that whether the land be improved in value, or whether it be impaired in value in the time of the heir, the endowment is still to be according to the value at the time of the assignment. And why should not the rule be equally fixed in the present case? There is no color for the suggestion in the books, that the time is unsettled, and depending upon the volitions of cither party. The rules of law are not subject to such alterations; and it is settled, from time-immemorial, and on principles of justice and sound policy, that the value of dower in case of alienation by the husband, is to be taken at the time of alienation, and not subsequently, and the rulei is not to bo disturbed to suit the views of one party.” It must bo borne in mind that the value of these lands had depreciated, still the widow took her dower, not according to this depreciated value, but according to the value at the time of alienation. If she is allowed to take in such case according to the value at the time of alienation, shall she not be compelled to do it when the land has increased in value?
The chancellor concludes his remark upon this part of the case-by saying: “Take one case with another, the land is more likely to increase than to diminish in value; because land is almost everywhere, in this country, in a state of rapid improvement, and the widow would be the gainer, in most cases, over the purchaser, *if we had it in our power to dislocate the rule of computation, and transler it from the time of alienation to the time of the death of the husband.”
These authorities are certainly sufficient to show that in New *485 Tork, at least, the law is well settled, that a widow shall be endowed according to the value of the land at the time of the alienation, without taking into the computation any increased value, whether arising from improvements made upon the land subsequent to the alienation, or from other extrinsic causes.
The same principle prevails in Massachusetts, 9 Mass. 8, 221. In New Hampshire, 2 N. H. 56. In New Jersey, Penn. 513. In South Carolina, 2 Hill, 256; 1 Bailey, 281. In Indiana, 2 Blackf. 523. In Virginia, 4 Leigh, 509.
The case of Tod v. Bayler, 4 Leigh, 509, was decided in the -court of appeals of Virginia in 1833. The cases of Thompson v. Morrow, 3 Serg. & Rawle, 291, and Powell and wife v. M. & B. Manufacturing Co., 3 Mason, 375, were before the court and relied -upon by counsel in argument. Still the common law rule was adhered to. Judge Carr says, “ I consider it the clear rule of the common law, that where the husband aliens during coverture, •and the widow claims dower after his death, she shall not be entitled to dower according to the improved value of the land, but must take her dower according to the value at the time of the alienation.” If she takes according to the value at the “time of the alienation,” and this is the language of Kent and other writers upon the subject, surely increased value, no matter from what cause it arises, is excluded from the computation.
Having thus ascertained the rule which has been established -at common law, and in several of the states, for the assignment •of dower where the land was- aliened by the husband, it may not bo improper to inquire what principle has been adopted in this state upon the subject. Considering our circumstances, and the situation of our country, it is not to be expected that many cases should have arisen in which a question like the one now under consideration would be involved. The state is new, and it is but as yesterday that the whole country was covered with the forest. In such situations, dower-claims as between the’widow •and the alienee would not be frequently pressed. But, as the state becomes more populous, and lands more valuable, this description of claims will be sought out and prosecuted. Although *1 have been somewhat acquainted with the history of ju•dicial proceedings in the state since 1806, I do not now recbllect a single suit for dower against an alienee out of the county of Hamilton, except, perhaps, one in the county of Ross, before *486 the present case. There probably have been cases in the court, of common pleas, which have not been removed into the Supreme-Court. But in the county of Hamilton such cases have not been unfrequent.
Some of these cases will be referred to in the order in which they occurred. At the July term of the Supreme Court in Hamilton county, 1822, before Judges McLean and Burnet, Martha. Ewing prosecuted four several writs of dower against John B. Ennes, John E. Keyes, G-eorge St. Clair, and Thomas Stanbery. The plaintiff claimed dower as the widow of Charles Conn. It appeared, from the pleadings in the case, that in the year 1801,. the land in which dower was démanded had been aliened by Conn. The suit was commenced in 1818. The property was of' that description which could not be divided, and the jury found the yearly value at the time of alienation, and also at the time of the commencement of the suit. It was decided by the court, that the widow should take her dower according to the value of the-property at the time of alienation. These cases, I have been informed, were very fully argued, and carefully considered by the-court, and this information was received from one of the judges who tried them, as well as from others who heard the arguments. It was in reference to one of these cases that Judge Burnet, in the-case of McArthur v. Porter, 1 Ohio, 111, remarks : “ In Ohio, it is admitted that the widow is dowable of lands mortgaged or aliened by the husband during coverture, if she do not join in the mortgage or deed of conveyance. And it has been decided in the case of Ewing v. Stanbery, that she shall be endowed with reference to the value of the premises at the time of alienation.”
At the June term of the same court in the same county, 1824,. which was holden by Judges Burnet and Sherman, and myself, Elizabeth McCullough prosecuted three several writs of dower, against Henry Hathaway, John S. Wallace, and Abraham Perris. It appeared that John McCullough, the husband of the demand-ant, died seized of the premises in 1803, and the court, in assigning dower, estimated the value of the property at that period. Whether' the alienation in consequence of which the defendants claimed title was made by the 'heir, or whether it *was-made for the payment of debts subsequent to the death of McCullough, does not appear in the case.
If I am correct in the construction of the ordinance of 1787, in *487 the cases of Ewing v. Stanbery and others, the plaintiff was not entitled to dower at all. The land was aliened in 1801, at which time the only law in force in the territory allowing the widow dower was the ordinance, and under that she was entitled to dower in such lands only of which the husband was seized at the time of his death. Whether this point was agitated or not does not appear, but it does appear that the court fixed upon the time of alienation as the time at which the annual value of the land should be computed.
At the May term of the Supreme Court of Hamilton county, 1828, the case of Catharine Brown v. John T. Barr came on for hearing, and an interlocutory decree was entered. At the next term the case again came before the court, and a final decree was made. The term of 1828 was holden by Judges Burnet, Sherman, and myself, and that of 1829 by Judges Pease and Sherman.
This was a ease in chancery. The complainant claimed dower as the widow of Daniel Brown, in a certain town lot in the town of Cincinnati. It appeared that the lot had been mortgaged by Brown to one Hunt, in 1817, and finally sold to the Miami Exporting Company on April 28, 1821. The petition was filed in 1826, and defendant claimed title under the Miami Exporting Company. It was decreed by the court that the complainant was entitled to dower, and that- she should be endowed according to the value of the lot on April 20, 1881, when aliened to the Miami Exporting Company,
Thus stood the law in Ohio until 1833, when the case of Dunseth v. The Bank of the United States was decided. 6 Ohio, 75.
But it is urged by the counsel that these decisions are not to be regarded. This is his language : “ I admit that much respect is due to circuit decisions, when they have been long acted upon, and a uniform practice and understanding have grown up under them. This is not the case with these decisions. The practice has been the other way ; and no argument against their notoriety can be stronger than the fact, that the Dunseth case arose in the county of Hamilton,. and no notice is taken of these cases, except in reference to what is said to have been held in one of *them. The court and the bar seem alike to have forgotten them.”
I am aware that decisions upon the circuit are not as well and as generally known as decisions made by the court in bank and *488 reported. But I suppose a decision made upon the circuit, if made by a full court and after mature deliberation, is just as binding upon the court itself, and just as good evidence of the law as if made by the court in bank. Neither a decision made upon the circuit nor in bank is such conclusive evidence of the law that it can not be reversed or overruled; and I trust that this court will never hesitate, when convinced that it has been in error, to retrace its steps. It is said that “the practice has been the other way ” from that which was established in the cases cited. But where is the evidence of this? No case is cited in’which a contrary practice has prevailed.
It is nothing remarkable that no notice should.have been taken of-these cases by the court in deciding the Dunseth case, when it is recollected that that case was not argued, and when it is further recollected that in 1833 there was not one of the judges who assisted in deciding those cases who was a member of the court. When the Dunseth case was reserved I was a member of the court( but not when it was decided. It was continued one term for argument, but through neglect of counsel was never argued. Why it was not I can not say, unless the counsel employed supposed that the law was settled by the decisions in the county where the case originated.
Having thus shown, as it seems to me, conclusively, that by the common law, by the decisions of the courts in the other states of this Union, and by the decisions of the highest judicial tribunal in this state, previous to the Dmnseth case, the rule established was, that if the husband sold the land the widow should be endowed according to the value at tho time of the alienation, I will now proceed to consider the principle sought to be established by the claimant in this case. That principle is this: In assigning to the widow her dower, the increased value of the land, in consequence of improvements made upon the land itself by the alienee, shall be excluded from the computation, but increased value from other causes shall be included. In other words, a widow shall not be endowed according to the value at the time of the alienation, but according to the value at the time of assignment, deducting from this valuation, however, the value of the improvements made by the alienee.
*It is not pretended that there is any decided case in England or in any state court in the Union, except in the Supreme *489 /Court of Pennsylvania, which goes directly to sustain this rule. It is admitted that the cases already cited from New York and Virginia are directly against it. But it is said that the courts of New York are governed by a statute, and that the decision in Virginia was only by a majority of the court. So far as respects dbe statute of New York, we have already seen that it is a mere .affirmance of the common law rule. The *force of the decisions in England and the other states is evaded by the assertion, that in those cases the question of “increased value from extrinsic causes” was never considered by the courts. Chief Justice Thompson, in the case of Dorchester v. Coventry, 11 Johns. 510, insists that there is no difference between improvements made by the alienee and increased value from other causes. He says, “the .same principle applies to both.” And if there be any difference, if this question of increased value from extrinsic causes is so very important, is it not a little surprising that nothing should have been said about it in England during the more than six hundred years since the rule in that country was established, nor within •these United States until within some twenty or twenty-five years past? In truth, the question does not appear to have been made in any decided case, so far as we are informed, until made in 1819, in the case of Thompson v. Morrow, 5 Serg. & Rawle, 289. Previous to that time the uniform and universal rule, so far as we know, was that the widow should be endowed according to the value at the time of alienation. And this from necessity excluded ■all increased value, no matter from what cause.
It is argued, however, that abstract, justice requires the adoption •of this modification of the old rule for the assignment of dower. This is unquestionably an.important consideration. Whenever a rule of law is found to operate unjustly it ought to be changed, either by legislative enactment or judicial decision, and the former mode'is far preferable.
But whether such change of this rule would be conducive to the ends of justice is, perhaps, somewhat problematical. In some cases it might have this effect; in others, however, it would be quite the reverse. Take a case where an individual, against the wishes of his wife, h'ad disposed of his property at the instigation of the alienee, and where it was done with a view to deprive her of her rights, it would seem to be just that upon the -^death of her husband, she should be endowed according to *490 tbe increased value of the land. But in ordinary cases, where husband and wife are one in feeling, and one in interest, as they are one in law, and where lands are in good faith sold for the benefit of the family, there is no justice, there can ho none, in giving the wife, if she survives her husband, the benefit of the increased value of the land. Take the case, which is very common, where the husband, with the avails of one tract of land, purchases another^ and after improving it, dies — where is the justice in allowing his widow the benefit of the increased value of both these tracts of land ? ' Take another case, where the husband sells land and vests the avails in personal goods, chattels, and merchandise, and with these makes gain and dies. The widow is entitled to one-third of this personal property, to the use of one-third of the land with which it was procured, and will it be said it is just, that in addition she should be entitled to the benefit of the increased value of the land ?
But there can hardly be a stronger case than the one under consideration to test the justice of the rule contended for. At the time this land was aliened, it was in a wilderness, and was of but little value. But through the energy and enterprise of the alienee, and those to whom he sold, this wilderness has become a cultivated country. In consequence of improvements made, and of extrinsic causes, the land has become immensely valuable. A town has been laid out, and in that town the seat of government for the state has been located. As a consequence of the location of the seat of government, the National road has been established in the neighborhood, and a navigable feeder to the Ohio canal constructed. All these things have a tendency to increase the value of the land. But to what extent each one severally has this tendency, it is beyond tbe power of man to tell. Now the question is, who in justice ought to receive the benefit of this increased value. The proprietors of the land, through whose agency, so far as individual agency is concerned, this state of things has been produced, or who-have paid a high price as the value of the land has increased, or should it be divided between them and this widow. What has she done to enhance the value of this land ? What have the heirs of her husband done? She has lain by for about thirty years, silent, as the grave, while this property has been passing from hand to hand, each individual paying for it its full value, and she now comes into this court to enforce this claim, which Chancellor Kent. *491 says, “ is a severe dormant incumbrance *upon the use and circulation of real property.” Can any one suppose that if this property had descended to the heirs of George W. Allen, the seat, of government of this state would have been established whore it now is ? Or that the National road or Columbus feeder would have been located where they now are? Or would these things have taken place had this claimant prosecuted for her dower within a reasonable time alter the death of her husband, and had the dower assigned her covered the lands in which she now seeks to recover ?' If not, why should she be placed in a better situation in consequence of the alienation by her. husband, than she would have been, had he died in possession? Justice may require it, but it-seems to me it must be justice of an extraordinary character. There is much good sense in a remark of Chief. Justice Savage, in the case of Walker v. Schuyler, 10 Wend. 486, and it is peculiarly applicable to this case.1 “It is certainly reasonable that the enhanced value should inure to the benefit of those through whose labor and sufferings and expenditures the appreciation has been procured. If the property has been rendered more valuable by the general improvements of the country, the defendant and not the-plaintiff has contributed to that general improvement."
While upon' this part of the case, it may not be useless to attend, for a moment to the character of the eases which are most frequently brought before the court for the purpose of obtaining dower, and here I have no reference to cases between the widow and heir, but to those between the widow and an alienee.
One class of those cases are such as have originated in the peculiar circumstances of the state. As has been already remarked, at an early period large tracts of land were held by individuals. This was the case with the Connecticut reserve, consisting of more than 3,000,000 of acres. There was also the Virginia military district, set apart for the officers and soldiers of the Virginia line on continental establishment. In addition to this, there was a large tract of country designed for the officers and soldiers of the revolutionary war generally, and for certain refugees from Canada. A very considerable portion of the lands in the Virginia military district, and in the United States military district, as well as all. the lands in the Connecticut reserve, were purchased in by individuals, who thereby became large landholders. And they were-purchased with precisely the same object with which a merchant. *492 lays in his stock of merchandise, that is, to sell again and make gain. These large proportions were not, *and many of them never have been residents of the state. They have contributed neither labor nor money for its improvement; nor to enhance the •value of property. They have sold their lands to the actual settler, and ho has made the improvements. He has contributed to •enhance the value of property generally. They have effected their objects, they have sold their lands for gain, and in this way, some ■of them at least, have accumulated great wealth. But in executing deeds of conveyance, it was done in many instances without :any relinquishment of the right of dower.
In such case, in order that justice maybe done, to a widow, is it necessary that a court, in assigning her dower, should take into ■consideration the increased value of the land, arising from all -other causes, except the particular improvements made upon it by the alienee?
It may be supposed that there are but few instances in which cases of this kind can arise; but it will be found, upon examination, that there are hundreds of thousands, if not millions of acres -of land in the state, in this situation, and subject to this “severe dormant incumbrance.” In many instances, it is fair to presume that neither party knew that the wife should join in a deed in -order that she might be barred of her dower. In others, it might have been supposed that as the widow, if endowed at all, must be ■endowed according to the rule of the common law, of course the dower would be of little consequence. This applies to deeds executed out of the state, for it will be found that in most of those ■executed within the state, and by our own citizens, there is a relinquishment of dower.
There is another class of cases, and these are probably the most numerous, that have or will come before the court; and this consists of cases where the wife has joined with the husband in the •deed and intended to release her right of dower, but has failed on .account of some technical informality. In such case, justice would require not only that the widow should not be endowed according to the increased value of the land, but that she should not be endowed at all.
From any view which I have been able to take of the subject, it seems to me counsel are mistaken in supposing that tha *493 ends of justice would be subserved by a modification of the common law rule.
It is not upon the position that justice requires a modification, of this rule that counsel alone rely. They insist that it is already" modified by judicial decisions, and that the settled rule *of law upon the subject is that which they advocate. The authorities, which they rely upon are a “dictum" of Chief Justice Parsons, in. the case of Gore v. Brasier, 3 Mass. 544; Thompson v. Morrow, 5 Serg. & Rawle. 289; Pond et ux. v. Morrison and B. M. Co., 3 Mason, 347; 4 Kent’s Com. 67; Dunseth v. Bank of United States, 6 Ohio, 76.
I have carefully examined all these authorities, and there can, be no question but that the three decided cases fully sustain the-counsel for the claimant.
As to the case of Dunseth v. Bank of the United States, I have-already said that it seemed to me proper that in the investigation-of this ease, if should be taken into consideration, because that case is now depending upon a bill of review; and on this account, it can not be considered as authority for the purposes of this case, with any more propriety than could the original case, which, by the present bill, is sought to be reviewed.
The case of Thompson v. Morrow, 5 Serg. & Rawle, 289, was-decided in 1819. There can be no doubt of the ability and integrity of the court by which the case was decided. But from an examination of the opinion of Chief Justice Tilghman, it would, seem tó me that he was laboring rather to sustain a preconceived-opinion than to ascertain, from an examination of authorities, what the rule had been held to be. Indeed,, he says, that himself and his associates, Yates and Brackenridge, had entertained the-opinion, that a widow was to be endowed according to the increased value of the land, excluding from the computation the improvements made by alienee. He says that he has looked into the year? books and does not find anything to contradict this opinion. He admits the rule of the common law, but supposes the question of increased value from extrinsic causes had been overlooked, or not considered, and therefore concludes that this might be taken into the computation without impairing that rule. He cites no-authority as directly in point to sustain his opinion, except the dictum of Ch. J. Parsons. He seems to consider this as having all the force of an adjudged case, and says, that he is not aware that. *494 it. has over been overruled in Massachusetts. He admits that the .authorities in New York are apparently against him, but supposes this may have been because there is a statute in New York, and by possibility this statute may have had some influence. In conclusion, he says, “Having considered all the authorities which bear upon this question, I find myself at liberty to decide %0-•cording to what appears to me to be the reason and justice of the case; which is, that the widow shall take no advantage of improvements of any kind, made by the purchaser, but throwing these out of the estimate, she shall be endowed according to the value at the time her dower shall be assigned to her.” This very mode of expression shows that the judge understood that he was making some innovation upon the rule, as previously understood-It seemed to him to be reasonable and proper, and finding no case wherein it had boon expressly held that the widow should not have the benefit of the increased value of the land from extrinsic causes, he was inclined to give it to her. And this, I believe, is the first case in England or America in which it has been so adjudged. The authority, and only authority quoted, as before remarked, is the dictum of Ch. J. Parsons, in G\ore v. Brasier.
Judge Story, in the case of Powell and wife v. The Morrison and B. M Co., 3 Mason, 347, takes much the same view of the subject as Judge Tilghman, and comes to the same conclusion He does not, however, place the same reliance upon the dictum of* Ch. J. Parsons, as an authority, but admits, that there is great uncertainty as to what was the opinion of that eminent jurist upon this particular point. The only decided case cited by Justice Story, as being in point to sustain his decision, is the case of Thompson v. Morrow. He bases himself, not upon decided cases» but, like Judge Tilghman, upon the assumption, “ that in none of •the cases has the question in relation to the advance of land, independent of the improvements by the alienee, ever come up.” An extraordinary assumption, it would seem to me, when we take into consideration, the fact that dower was a favorite of the law, the length of time since the common law rule was established, and the character of the courts before which it has passed in review.
These are the only two decided cases favoring this view of the subject, taken by the counsel for the claimant in the case before this court, previous to the case of Dunseth v. Bank of the United *495 States. I say they are the only decided cases, because I know the counsel too well to believe that a single case favoring their views would be overlooked. True, the counsel cite a case from. 1 Bland’s Ch., in Maryland, but that was a case between the widow and heirs and of course has no application to the case before this court. It is said, too, in Kentucky there *was a case decided in 1833, which goes measurably to sustain the new rule, but that case does not seem to be much relied on.
So far as direct authority is concerned, the case of Powell et ux. v. M, and B. Manufacturing Company is based upon the case of Thompson v. Morrow, and this latter case is based upon the sup. posed opinion of Ch. J. Parsons. This “ dictum, ” of Ch. J. Parsons, which is thus used, and is made the foundation for the charge of an ancient and well-known rule of the common law, and of many of the states of the Union, is found in the case of Gore v. Brasier, 3 Mass. 529. The case is a long one, and this dictum, is found at page 544,
This was not an action of dower, nor had it connection with such an action, except by analogy. It was an action of covenant broken, upon a deed containing the general covenants. The first count in the declaration alleged a breach of all the covenants — the second, the breach of the covenants of warranty, and against incumbrances. The value of the land at the time of conveyance to Gore, was §9,000; at the time of his eviction, §15,000. Many questions were involved in the case, but the particular question under consideration when the dictum was uttered, was with respect to the rule of damages for a breach of the covenant of warranty. . Alter a full consideration of the whole subject, the chief justice says, at page 546 : “The court are of opinion, conformably to the principles of law, applied to personal actions of covenant broken, to the ancient usage of the state, and to the decisions of our predecessors, supported by the practice of the legislature, that the plaintiff in this action ought to recover in damages the value of the estate at the time of eviction.” Consequently the defendant was compelled to pay §15,000 damages, when in fact he received but §9,000 for the land. This decision was based, however, not upon the common law rules applicable to this class of action, but “ upon the ancient usage of the state,” and previous decisions of the same court, “ supported by the practice of the legislature.”
In commenting upon the case, he says, “By the ancient corn *496 mon law, the remedy on a warranty was by a voucher or warrant tia charter, and the recompense recovered in those suits was other lands to the value at the time the warranty was made. This was-the general rule; but when the warrantor, on being vouched, entered into the warranty generally, he was bound to render other lands to the value of the lands lost at the time he *entered into-the warranty. In valuing the land lost, when the voucher entered into the warranty specially, no regard was had to any improvements made by the tenant, as by erecting edifices, or turning pasture into arable land, nor was the discovery of a mine in the land lost, after the warranty,.but then not known, considered in ascertaining the value of the land to be recovered in recompense..
“ An effect originating in this feudal principle may be discovered in this state, in the assignment of dower against a purchaser. When the husband- aliens with warranty during the coverture, and afterward dies, his widow shall not be entitled to the-benefits of the improvements made by the purchaser, because he could not recover their value in other lands against the heir on the warranty of the husband. This rule is now supported in this state on principles of public policy, that purchasers may not be discouraged from improving their lands.”
Here the common law rule for the assignment of dower is given, and the reason for that rule, and that is because the purchaser, or alienee, could not recover the increased value against the heir, but must be confined to the value at the time of alienation. But although the reason for the rule had ceased in Massachusetts, inasmuch as it was there holden that in ease of eviction-the warrantee could recover against the warrantor the value of the land at the time of eviction, still, it is said this rule is now supported in this state on principles of public policy.
And here let me ask, if public policy in Massachusetts requires-that the common law rule for the assignment of dower should be-sustained, “that purchasers may not be discouraged from improving their lands,” although the reason for the rule in that state has^ ceased, does not public policy in Ohio equally require that it should be sustained here? Is there not the same necessity here that purchasers should be encouraged to improve their lands?' Was there not a ten-fold greater necessity for it at the time the right of dower in the case before the court was consummated? But in Ohio the reason for the rule remains in full force.-
*497 In an action of covenant for breach of the covenant of warranty, this court has uniformly held that the recovery must be limited to the value of the land at the time the warranty was made, or, in other words, to the consideration money and interest. No matter what may be the increased value, no matter what may be the causes of that increased value, this is the extent of the recovery. Such is the settled law of Ohio.
*In the case of King v. Kerr’s Adm’rs, where the subject is treated of, it is-said by the court, “in this state, where real propertjr is rising fast in value, the value on eviction would be ruinous to the warrantor.” 5 Ohio, 154. I would ask if such a rule would be ruinous to the warrantor, will not that rule be equally ruinous to the warrantee which permits a widow to take from him one-third of the increased value of the land in way of dower, and prohibits him from recovering the same ever against the heir of the warrantor? The action is not always against the immediate alienee of the warrantor, but frequently against a subsequent purchaser, and one who has paid a full price for the land, according to its increased value. In Massachusetts, the widow can recover dower only according to the value of the land at the time of alienation, although if she recovered according to the increased value, the alienee might recover over against the heir to the same extent; but in Ohio, it is contended that she may recover according to the increased value, although the alienee can recover over against the heir only according to the value at the time the warranty was made, or at the time of alienation.
But to return to the case of Gore v. Brasier. After having stated that the common law rule was supported in Massachusetts on principles of public policy, the judge proceeds: “If the lands have greatly risen in value, not from any improvements made upon them, nor from the discovery of any new source of profit, but from extrinsic causes, as the increase of commerce or population, it may he a question whether upon the extendi ad valentiam, the lands to be recovered in recompense would be valued at the increased price, so that- the quantity might be proportionably reduced. This is but a question of mere curiosity, unless it should be considered as relating to the lands to be assigned to the widow for her dower. If the husband during the coverture had aliened a real estate in a commercial town, and at his death the rents have trebled from various causes, unconnected with any improvements *498 -of the estate, and the widow should then sue for her dower, perhaps it would be difficult for the purchaser to maintain that one-•ninth part only, and not one-third part should be assigned to her.” This is the 11dictum” of Chief Justice Parsons, about ■which so much is said, upon which so much reliance is had, and -upon which the new rule established in the case of Thompson v. Morrow is based.
The case supposed is simply this : the husband aliens land, and the purchaser makes no improvement. The land remains in *sta.tu quo until the death of the husband, at which time, owing to increase of commerce or population, the land has trebled in value; in such case a doubt is suggested whether the widow ■might not have assigned to her one-third of the land. The particular case put is of the sale of a lot in a commercial town. What is the similarity of such a case to the case of Thompson v. Morrow? In this latter case, the lot did not remain in the same situation as when sold, but the purchaser had made improvements. But there is still less analogy between this hypothetical case and the case before the court. In the case before the court, the sale was not of a lot in a commercial town, but of a large tract of wild or unimproved land in a wilderness, and, if there were any analogy to carry it out, the land should have continued, in a wild and uncultivated slate, not only at the time of the death of the husband, but up to the present time, when the dower is claimed.
Can it'be believed that Judge Parsons had in his mind a case like the one before the court? Justice Story doubts whether he had in view a case like that of Powell et ux. v. M. and B. Manufacturing Company, much less can it be believed he had in view a case like this. But even in the hypothetical case put, the •chief justice expresses no opinion. He speaks doubtingly, “perhaps it would be difficult,” etc. Judge Tilghman, however, considers this as evidence of the iaw in Massachusetts, and says, he is not aware that it has been overruled in that state. Yet in the case of Catlin v. Ware, 9 Mass. 218, which was a case in dower, and decided five years after the case of Gore v. Brasier, the Supreme Court of Massachusetts, Parsons being on the bench, held that the widow should be endowed according to the value at the time of alienation, and nothing is said about increased value.
The opinion of Chancellor Kent is referred to by the counsel for *499 the claimant as going to sustain the principle whieh'they advocate. But, before examining the opinion of the chancellor, it may not be out of the way, as the only decided cases, quoted to sustain this new rule, are from Pennsylvania and Massachusetts, to remark, that was this ease depending in the courts of either of those states, the widow not only would not recover her dower according to the increased value of the land, but she would not recover dower at all. She could not- recover in Massachusetts, because these lands were wild when sold by her husband. 15 Mass. 164; 1 Pick. 21; 7 Pick. 143. She could not recover *in Pennsylvania, because the lands were sold by a judicial sale. 2 Dallas, 127.
I have already referred to the opinions of Chancellor Kent, while he was judge of the Supreme Court of New York, and while -he was chancellor of the same state, and have quoted his exact-language, knowing it to be stronger and more appropriate than •any I could urge in favor of the opinion which I entertain upon this subject. In the case of Hale v. James, 6 Johns. Ch. 258, which was decided long after the eases of Gore v. Brasier, and Thompson v. Morrow, after stating the rule of the common law, he says, that to take the value of the land at the time of the death of the husband, excluding improvements made by the alienee, would, in this country, be more favorable to the widow, because lands are generally increasing in value, and intimates that this rule might be adopted, “if we had it in our power to dislocate the rule of computation, and transfer it from the time of alienation to the death of the husband.” This language strongly implies that it could not be done except by a breach or violation of law.
In his Commentaries (vol. iv, 66), after stating the rule of the •common law in the assignment of dower, he says, “ This is the doccrine of the American cases, and they are in conformity with the general principles of the English law, as to the time from which the value of the dower is to be computed,-both as it respects the alienee of the husband and the heir.”
On page 68 of the same volume, is found the expression which is relied upon as sustaining the new rule. After referring to the cases of Gore v. Brasier, Thompson v. Morrow, Powell and wife v. M. and B. Manufacturing Company, the chancellor says: “ The better and more reasonable general American doctrine upon this subject, I apprehend to be that the improved value of the land, *500 from which the widow is to be excluded, in the assignment of her dower even as against a purchaser, is that which has arisen from the actual labor and money of the owner, and not from that-•which has arisen from extrinsic or general causes.
I do not know that I rightly understand what the chancellor means by the “better and more reasonable" doctrine. If by it he mean that the doctrine by him here stated is “ better and, more reasonable," because more consistent with abstract justice, this is a matter about w hich there will be a great difference of opinion, and individuals would be influenced in a great measure by ^preconceived notions upon the subject of dower. For one, I am free to confess, that in the present state of society, and in ordinary cases, I can see but little abstract justice in allowing a widow, whose husband has sold land and applied the avails of it 'to her benefit and to the benefit of the family, to come in and claim from the purchaser, who has paid the full value of the land, the use of one-third of it during her natural life. But there is justice, where her husband dies seized of land, that she should have the use of one-third of it for her support and maintenance. In the latter case, she^receives her support from the avails of the labor and industry of herself and husband; in the former, from the avails of the industry of a stranger.
If the chancellor, by “ better and more reasonable,” means that this new doctrine is better sustained by authority, I think he is mistaken. In favor of it are two and only two cases — one decided in Pennsylvania, and the other in the Circuit Court of the United States for the district of Massachusetts. Against it are his own decisions while judge of the Supreme Court in the State of New York, and while chancellor of that state; numerous decisions in the same Supreme, Court since he ceased to be a member of it; decisions in the Supreme Court of Massachusetts, and in the highest judicial tribunals in New Hampshire, New Jersey, South Carolina, Virginia, Kentucky, and Indiana, to say nothing of the cases-decided in this court as before referred to. Should it bo said, that in most of these cases the precise question, as to taking into computation in assigning dower, the increased value of the land arising irorn extrinsic causes was not taken into consideration, I can only reply that, in three cases in New York and one in Virginia, it was the point principally agitated.
From the careful examination which I have given this subject,. *501 and I have endeavored to give it the most careful attention, it does seem to me, that upon principle as well as upon authority, the rule of law is well settled, that when a widow claims dower in. lands •which have been aliened by her husband she shall be endowed according to the value of the land at the time of the alienation. .My brethren differ from me, and therefore 1 ought to distrust my own opinion ; but, after the most anxious reflection, I can not see it to be otherwise. It seems to me, further, that this rule is in conformity with justice and reason, and peculiarly applicable and appropriate to a new state like Ohio. And I am fearful that the change or modification of it will be followed, in many instances, by ruinous consequences. As the decree, in the case sought to be ^reviewed, directed the dower to be assigned according to the present increased value of the lot in question, excluding improvements made by the purchaser, I think it was erroneous and should be reversed.